### ROBINSON v. ALABAMA & G. MFG. CO.

(Circuit Court, N. D. Georgia. February 23, 1898.)

1. MORTGAGE FORECLOSURE — MORTGAGEE AS PURCHASER UNDER ERRONEOUS DECREE—ACCOUNTING.

A mortgage creditor in possession as a purchaser in good faith under an erroneous decree of foreclosure, afterwards reversed, is chargeable on restitution with only the profits actually earned by the property, unless guilty of willful default in management, by reason of which the earnings were less than they would have been under ordinarily careful and prudent management.

2. SAME—INSURANCE PREMIUMS.

In such accounting, where the mortgagor has been held entitled to restitution, the purchaser stands in the position of a mortgagee in possession, and where he has kept the property insured, though in his own name, should be credited with the premiums paid for such insurance, which in case of loss would have inured to the benefit of the mortgagor.

3. EQUITY PRACTICE—HEARING BEFORE MASTER—EVIDENCE.

The use of books of account by a master, after they had been impeached as books of original entry and excluded as evidence, the entries, however, not having been shown to be incorrect or fraudulently made, as data for finding other evidence, and the consideration, in stating the account, of

such entries as were corroborated by other evidence, was not error which invalidated his findings.

4. MORTGAGES—MORTGAGEE IN POSSESSION—RENTS AND PROFITS.

A mortgagee lawfully in possession of the mortgaged property, though as purchaser under an erroneous decree of foreclosure afterwards reversed, while accountable for the rents and profits during the time of such possession, has also the right to apply the same on the mortgage debt as against the mortgagor or any purchaser from him of the equity of redemption; and where there has been a resale of the property, and he has obtained a deficiency judgment against the mortgagor before the accounting is had, he may have such judgment set off against the amount found due from him.

5. SAME—SCOPE OF ACCOUNTING.

Where a purchaser of a cotton mill at a foreclosure sale, afterwards set aside, was placed in possession by the court, and during such possession used certain material found in the mill not covered by the mortgage, on restitution of the property and an accounting for rents and profits the court has jurisdiction to also require an accounting for such material.

6. EQUITY PRACTICE—STATEMENT OF ACCOUNT BY MASTER—INTEREST.

Where a master has stated an account, allowing interest on some items, and not on others, and the report is confirmed without exception on that ground, the amount stated will be regarded as including the interest at the time of the report.

Intervention of the Huguley Manufacturing Company for accounting for rents, issues, and profits.

B. F. Abbott and Dorsey, Brewster & Howell, for complainants.

W. R. Hammond, John M. Chilton, John C. Reed, and Allan Fort, for defendants.

NEWMAN, District Judge. The greater part of the previous history of this case can be found in the opinions of the court in Robinson v. Manufacturing Co., 51 Fed. 268; Id., 6 C. C. A. 75, 56 Fed. 690; Id., 67 Fed. 189; Id., 19 C. C. A. 152, 72 Fed. 708. After the last decision of the appellate court, as reported in 19 C. C. A. 152, 72 Fed. 708, supra, the property was sold under the last decree, and bought by the same purchasers as at the former sale. Subsequently the following order was made:

"It is ordered that this case be referred to Thomas B. Felder, Esq., for the purpose of taking an accounting of the proper receipts and disbursements incident to the custody and operation of the mortgaged property, and of the rents and profits earned, or that should have been earned, since its delivery to the purchasers under the former sale; and to ascertain whether there has been any conversion of the property connected with said property, and the amount and value of the same, as to whether there has been any waste or damage to the property, and as to whether the same is the result of ordinary wear and tear, and as to the liability of the holders of the property therefor." "This March 16, 1896."

The report of the special master was filed October 9, 1897, so that the hearing before the special master occupied something like 18 months. Of course, the hearing was at intervals, as suited the convenience of counsel and the special master, and as the necessity for getting witnesses and testimony required. The special master having filed his report, exceptions were made by both sides, and it is on these exceptions that the present hearing is had. The special master reported against the purchasers of the property $39,713.51, which

was awarded in favor of the movants. against the Galeton Cotton Mills. The exceptions need not all be noticed in detail, as they can be embraced under a few general heads, which, it is believed, will cover the entire subject-matter of the report and the exceptions.

Counsel for the movants claim that the special master evidently misunderstood the order of the court, and put an incorrect construction thereon, in that he was required to "take an account of the proper receipts and disbursements incident to the custody and operation of the mortgaged property, and of the rents and profits earned, or that should have been earned, since its delivery to the purchasers under the former sale." They contend that the effect of the order of the court was to determine in advance that the correct rule to be observed by the master was to ascertain what the property by good management should have earned, as well as what it really did earn, during the period in question. My own construction of this order would be that its meaning was that the special master should ascertain the proper receipts and disbursements incident to the operation of the property, if he should find that it had been operated, or what it should have earned in the event it had not been operated.

The special master, in his report, states the following to be the rule which he adopted in ascertaining the amount for which the holders of the property should be held liable:

"The Galeton Cotton Mills, having obtained possession of the property under an erroneous decree of foreclosure, which decree was appealed from and reversed, the main issue between the parties is as to the rule of liability which should be applied under these circumstances. In the opinion of the undersigned, the Galeton Cotton Mills, being a creditor in possession under an erroneous decree of foreclosure, is chargeable only with the profits actually earned, or those which would have been earned but for its own willful default,"—citing, in support of the foregoing, Page v. Blackshear, 78 Ga. 597, 3 S. E. 423; Hogan v. Stone, 1 Ala. 496; Pom. Eq. Jur. §§ 1216, 1217; Snell, Eq. 308; Coot, Mortg. 18 Law Lib. p. 152; 2 Jones, Mortg. 1123; Bolling v. Lersner, 26 Grat. 61; Morris v. Budlong, 78 N. Y. 556; Thornbrough v. Baker, 2 White & T. Lead. Cas. pt. 2, pp. 1979–1983, Eng. note 2.

The special master then proceeds to say that:

"The evidence does not show that the Galeton Cotton Mills has been guilty of any willful default in the management of the property, or in earning profits, but, on the contrary, shows that the company has made the most that could be made out of the property in the condition it was in when they received it."

In other words, the conclusion of the special master seems to have been that the Galeton Cotton Mills were only liable to account for such profits as they made while operating the mills in good faith, and with reasonable care and prudence. The converse of this proposition is that the company operating the mills would have been liable for such amounts as they ought to have made if the evidence had shown that in bad faith they had operated the mills so as to produce less than they would have produced by ordinarily careful and prudent management. This seems to state the correct rule on the subject. The purchasing committee for the bondholders, from whom the Galeton Mills obtained the property, purchased the same in good faith, under a decree regularly entered in this court, and at a time when there had not only been no appeal from the decree, but when an appeal which had been commenced had been abandoned by the then

counsel for the defendants in the case. They must have come into possession of the property in good faith, believing in their title. It was rather a close question as to whether or not the defendants were entitled to restitution at all after the reversal of the first decree by the appellate court, but restitution was ordered after a careful investigation on certain conditions which were not complied with, and which the appellate court approved. The fact that the appellate court also entertained some doubt as to whether or not it was a case where restitution should be ordered, I think, may be fairly gathered from a clause in the last opinion of that court, in which this language occurs:

"We are therefore relieved from inquiring into and deciding whether the case was one calling for restitution, as the appellants insisted that it was. The court held that it was, and the other parties have not appealed."

This question is settled now, however, and is referred to only to show the extent of the good-faith holding of the purchasers when they entered into possession of this property, and organized the Galeton Cotton Mills, and to support the conclusion just stated that they would certainly be held to no stricter rule than to account for what they actually earned in the operation of the property while acting in good faith, with ordinary and reasonable care and diligence. The determination of this question goes very far towards a determination of all the contentions in the case. The master having found, after a long and tedious examination of all the books, papers, and accounts, and after having heard the testimony of all the parties at interest, that there was no willful default or bad faith on the part of the Galeton Cotton Mills in the management and control of this property, it would require, of course, a clear case of error to justify the court in interfering with the conclusion reached by him. No such error is apparent. On the contrary, an examination of the record in this case tends to support the conclusion of the master. It seems reasonably clear that the mill was operated in the ordinary and usual way, and also that, instead of the facts and circumstances showing any bad faith or willful failure to earn profits, they show the reverse.

In reference to the profits arising from the operation of the mill, the two principal matters in regard to which it is claimed by the movants that the special master erred are as to the purchase of the cotton used in the mill, and the prices paid for it, on the one hand, and the sale of goods manufactured at the mill, and the prices received for the same, on the other hand. It appears from the evidence in the case that the cotton for this mill and for two other mills was purchased by W. C. & L. Lanier, of West Point, Ga., near where the property in question was located. It is claimed that the cotton furnished the mill by W. C. & L. Lanier was charged to them at a higher price than cotton ruled in the markets at the dates that the different lots of cotton were delivered. The argument in favor of this contention is mostly based on a statement of averages as to the ruling price of cotton at different dates while the mill was being operated, compared with the price of the cotton delivered to the mills. The claim for the movants seems to be that

L. Lanier, of the firm of W. C. & L. Lanier (the firm purchasing the cotton), was the principal owner of the Galeton Mills, and largely interested in this controversy, and that the cotton was so manipulated as to charge it to this mill at a higher price than was just or proper, and for more than it cost or was worth in the market. The special master went into an exhaustive examination of this question. He heard a large amount of evidence, and had at his command all the data that could be desired for reaching a correct conclusion on the subject. He found against the movants on this question. The part of his report referring to the same is as follows:

"It is also insisted by movant that the charges for cotton purchased by the Galeton Cotton Mills were higher than the ruling market prices at the dates of purchase, and that the movant is entitled to a credit for the difference between the price paid for cotton and the price for which it could have been procured. On this point some of the witnesses testified that the Galeton Cotton Mills always paid the market prices. The cotton for this mill was purchased by W. C. & L. Lanier, who also did the buying for several other mills during the same period of time. Mr. Lanier testified that the cotton was charged to the Galeton Cotton Mills at the same prices as to the other mills, the same being the actual cost of the cotton. He admitted that in a few occasional instances cotton was furnished to the mill 'to be priced'; but this was not the custom, and it was done in such comparatively few instances and comparatively small purchases that it does not appear that the mills sustained loss thereby to any appreciable degree. To support the alleged overcharge on cotton, the widest latitude was allowed movant in the introduction of testimony, and a number of witnesses were examined as to the average market prices of various grades of cotton in Atlanta, Lagrange, Newman, and West Point. In addition to this, the cotton books of several large firms in West Point, who dealt in cotton, were introduced. It does not appear from this mass of testimony that the Galeton Cotton Mills have paid more for their cotton than it could have been procured for at the time it was bought. The movant undertakes to establish such an inference by a comparison of the prices paid with certain average prices of cotton for specified months. It would seem that the proper way to show such overcharges, if they existed, would be to show the date and amount of each purchase, and the market prices of cotton in West Point, on those days. On the whole, the undersigned is of opinion that the claim of overcharge on cotton purchased by the Galeton Cotton Mills is not made out by the evidence, and therefore said claim is disallowed."

I have been furnished by the movants with some data, and, after carefully examining it in connection with the whole case, I am satisfied that there is no just reason for interfering with the conclusion of the special master on this point.

In reference to the claim that goods were sold for less than the market price, the special master reports as follows:

"It was further claimed by the movant that the products of the mill were sold at inadequate prices. This mill was engaged in the manufacture of cotton ducks, known as 7 oz. and 10 oz. duck, respectively. The movant introduced a number of witnesses who testified to the average prices of these classes of goods, and seeks to show, by a comparison of the average prices testified to by these witnesses with the average prices realized by the Galeton Cotton Mills, that the prices realized were far below what they should have been. It would seem that, in impeaching the account of sales rendered by the respondent, the movant ought to show that the goods at the time they were sold brought less than the market price of the same grade of goods at the time and place of sale, and that the failure to realize the best price obtainable was by the willful default of the respondent. Neither of these

propositions is shown by the evidence. While the evidence for the movant, in the shape in which it is presented, may suggest an inference that the goods sold for the account of the Galeton Cotton Mills ought to have brought better prices, still the evidence strongly indicates that the product of this mill was not equal in quality to those goods to which the market prices applied. Furthermore, so long as the selling agents acted in good faith, and sold the product of the mill at fair prices, not necessarily the best prices, the movant would have no cause to complain. The undersigned is of opinion that the selling agents of this mill realized a good price for its products, and perhaps as good prices as could have been gotten under the circumstances; and therefore the finding must be against the claim of the movant that the prices realized for the goods produced by the mill were grossly insufficient." "Indeed, in regard to the claim of overvaluation of cotton bought and undervaluation of goods sold, the undersigned thinks that the movant must stand by the actual results until he can show that those results are materially different from what they should have been, and that they were brought about intentionally or by negligence so gross as to amount to willful default."

I am unable to find any error in this part of the special master's report. He had the evidence of these sales all before him, and seems to have examined quite a number of witnesses as to the actual price of goods of the same kind and quality, and concluded "that the selling agents of this mill realized good prices for its products, and perhaps as good prices as could have been gotten under the circumstances." And this is justified by the facts. Counsel for the movants were informed during the argument that the court was thoroughly satisfied, on this branch of the case, with the master's report; but it has been argued in the briefs submitted since, and, though careful consideration has been given the argument thus submitted, I find no reason to change the conclusion reached, on the hearing, that the master's report on this branch of the case was, at least, fully justified by the evidence, if, indeed, the evidence did not require it.

In this connection, there was considerable discussion on the argument of the case, and there has been since in the briefs of counsel, as to certain books which were offered in evidence by the purchasers of this property. The books were first admitted in evidence, and afterwards it turned out from water marks that they were made after the date of certain entries. For this reason the master ruled them out, and stated that he would only use them, in his examination of the case, so far as they were supported by other evidence, vouchers, etc. It is not shown anywhere, so far as I have seen in the evidence, that these books contain incorrect entries, or that anything entered on them was fraudulently entered in order to mislead and deceive. It would seem from what appears in the record that the master only used these books, so far as they were useful, in finding other data to use in his investigation of these accounts. I am wholly unable to see any harm that was done the movant by such use of these books. If the master verified all of the entries on the books before he made any use of them, that was certainly as much as could be asked, and this he seems to have done.

The special master, in his report, says:

"It was shown to the satisfaction of the undersigned that the books introduced by the respondent, to wit, the journal and ledger, purporting to be the books of original entry of the Galeton Cotton Mills, were not such, but

the same appeared to be copied. Yet all the original vouchers from which, no doubt, the original books of entry were made up, were brought into the court, and tendered along with the said books. These vouchers were submitted to the inspection of the adverse party, as well as to the court."

It is also insisted that the master failed to comply with the seventy-ninth equity rule, which requires all parties accounting before a master to bring in their respective accounts in the form of debtor and creditor, etc. The master seems not only to have complied with this rule, but to have gone beyond it. He not only had a statement of the account brought in by L. Lanier, whom the movants seem to treat as their real antagonist in the case, but he had all the books, vouchers, cotton tickets, account sales, etc., before him. Counsel for the movants referred to this mass of evidence as "bushels of papers," and perhaps this is not an exaggeration. These papers were shown to the court in baskets at the hearing, and it was stated, and not denied, that the fullest liberty of examination of the whole matter was given to the master and to counsel on the hearing.

This covers the main contentions for the movants in the case as urged by them on the argument and in the briefs since filed, and disposes of the case so far as it is necessary to discuss the same.

There are three principal grounds of exceptions on the part of the Galeton Cotton Mills to the report of the master. The first relates to the conversion by the purchasers of this property of certain supplies and findings which, it is claimed, did not pass by the sale, and which belonged to the Huguley Manufacturing Company. There is some difficulty as to this item, but I am unable to find satisfactory reasons for interfering with the special master's conclusions. There is doubt as to its correctness as matter of fact, but it is only a doubt. I have concluded, therefore, to let this item stand.

The next ground of exception claimed by the purchasers is as to the waste. I was impressed on the argument with the contention for the purchasers that the master had misconceived the evidence on this subject; but an examination of the record shows that there was evidence to justify this finding. Indeed, if the master had followed some of the witnesses in the case, he would have found a somewhat larger amount than he did against the purchasers on this head. The ruling of the master upon this subject will not be disturbed.

The next exception for the purchasers is as to the refusal of the master to allow the Galeton Cotton Mills the amount paid out by them for insurance on the property. The finding of the master as to this item is as follows:

"It appears that respondent kept the buildings, etc., insured, loss, if any, payable to the Galeton Cotton Mills, for the sum of $75,000, at the rate of one per cent. per annum. If the buildings had been consumed by fire, the proceeds therefor would not have inured in any wise to the benefit of the mortgagors. There seems to have been no contract wherein the Galeton Cotton Mills was authorized to take out this insurance, and charge the cost of it to the movant. This being true, it is the opinion of the undersigned that respondent had no right to charge to operating expenses the insurance premium; and I therefore find in favor of the movant, against respondent, on this ground, the sum of $3,502.52 principal, and interest from the 30th day of April, 1896, at the rate of 7 per cent. per annum, making $353.45."

As to the finding upon this item, I think the special master was clearly in error. The holding of this property by the purchasing committee for the bondholders, and afterwards by the Galeton Cotton Mills, has been analogized all along to the holding of real estate by a mortgagee in possession, with the same rights, duties, and liabilities, except, as is probably true, that these purchasers, in view of the manner in which they went into possession, the character of their possession, etc., would be entitled to somewhat more liberal treatment than the usual mortgagee in possession. It is certain that no stricter rule of liability would be applied to them than that to which the law would hold a mortgagee in possession, whose duty it was to account to the mórtgagor; and, even in this view of the matter, it seems clear that it was the duty of the parties in possession of this property to keep the same insured. It appears from the report of the special master that this insurance was taken out in the name of the Galeton Cotton Mills, but it would have inured, in case of loss, necessarily to the benefit of all parties at interest. A memorandum attached to the brief of counsel for the purchasers shows that the $3,502.52 was not all on real estate and machinery, but that part of it was on cotton in process of being worked, and manufactured goods, the output of the mill. This statement shows $1,815 on buildings and machinery, and $1,687 on cotton goods. Unquestionably, the purchasers should be allowed credit for this latter sum,—on the manufactured goods going through the mill,—as one of the expenses of the business; and I am about as well satisfied as to their right to the $1,815 on buildings and machinery, if this memorandum represents the facts of the case. I am unable, however, to find anything in the evidence which shows any such division of the insurance as this statement claims; and it must therefore be treated, for the purposes of this decision,—controlled, as the question here is, by the record,—as insurance on buildings and machinery. Even allowing this to be true, I think the special master should have allowed the purchasers this $3,502.-52 as a credit. Treating the holders of this property as mortgage creditors in possession, which is the effect of the decisions heretofore made in the case, it was reasonable care on their part to keep the property insured for the benefit of all the parties at interest. It was probably their duty to do so. But, in any event, in case of fire the amount received for insurance would necessarily have resulted as a benefit to the mortgagors. Looking at it in another way, it was a proper and legitimate expense connected with the holding and management of the property, and one which could be paid out of the earnings of the mill. Why it should not be allowed as a just expense in connection with the possession and management of this property, I am wholly unable to see. No attempt will be made to discuss the numerous authorities cited pro and con. Sufficient it is to say that I am satisfied, upon the law and facts, that the amount above named—$3,502.52 principal, and $353.45 interest—should be deducted from the finding by the master in favor of the movants. Making this deduction, there would be left $35,-857.54 in favor of the movants. The other exceptions by both par-

ties are hereby overruled, and the report of the special master, except as stated, is confirmed.

(April 11, 1898.)

Application to tax costs, and to apply rents and profits to mortgage debt. In order to make clear what is now for hearing and determination in this case, it is probably best to give a brief statement of what has occurred before during the progress of the case. On the 21st day of January, 1891, J. J. Robinson, trustee, filed a bill in this court against the Alabama & Georgia Manufacturing Company, the Huguley Manufacturing Company, and W. T. Huguley, for the purpose of foreclosing a mortgage executed by the Alabama & Georgia Manufacturing Company to Huguley, Yancey, and Robinson, as trustees. Yancey was dead; Huguley's interest was alleged to be adverse to that of the bondholders; so that Robinson filed the bill alone, and made Huguley a party defendant. The foreclosure was for default in the payment of interest. The defense was that the interest was tendered within the time required, and that, under the facts, complainant was not entitled to a foreclosure. A decree was rendered foreclosing the mortgage, in the circuit court, which was reversed in the circuit court of appeals, not because of any error in the decision of the circuit court that complainant was entitled to foreclosure, but on the ground that there had been no accounting as to the bonds on which the interest had been paid, and those on which the interest had not been paid. In the meantime, and pending the appeal, the property had been sold, and had been bought in for the bondholders by a committee representing their interests. The case coming back to the circuit court, the Huguley Manufacturing Company demanded restitution, which was awarded on certain conditions, which conditions were not complied with. The case was referred to a master; an accounting was had; and decree subsequently rendered foreclosing the mortgage for $45,000 principal and $17,005.92 interest, with costs. Under this decree the property was sold for $66,000. Afterwards the property was again sold, and bought by the former purchasers; that is, by the mortgage bondholders. There had elapsed between the first and second sales three years and eight months. An application was made to the court by the Huguley Manufacturing Company to require the purchasers to account for the rents and profits during the time of their possession under the first sale and before the second purchase. An order was granted to this effect, and a master appointed to hear evidence and take the account. The master, after a lengthy hearing, reported the amount of the rents and profits during the three years and eight months, which report, after slight modification, was approved for $35,857.53. Judgment had been entered in favor of Robinson, trustee, for any deficiency between the amount of his debt and the amount the property brought at the sale. This deficiency is a few thousand dollars more than the amount of the rents and profits found by the master against the purchasers. Motion is now made by the purchasers (who, as stated, are the bondholders) to set off against the amount found for rents and profits during the time of their possession between the two sales the amount

of the deficiency decree. This is resisted by the Huguley Manufacturing Company, it claiming the rents and profits; and that is the question presented now for determination.

The mortgage under which the property was sold was made by the Alabama & Georgia Manufacturing Company in January, 1884. Subsequently, by reason of some litigation in the state court, the property of the Alabama & Georgia Manufacturing Company went into the hands of a receiver, and was sold and bought by persons who afterwards organized the Huguley Manufacturing Company, they buying at the receiver's sale subject to the mortgage of Robinson, trustee. The contention now is that, while the Alabama & Georgia Manufacturing Company owes the amount of the deficiency decree, the Huguley Manufacturing Company does not, and that, consequently, a debt against the Alabama & Georgia Manufacturing Company cannot be set off against a debt which is due to the Huguley Manufacturing Company. The said last-named company having been deprived of possession by virtue of the first sale, it is claimed that the possession of the purchasers was in its right, and that the rents and profits accrued to it. The proposition, stated in general terms, is this: That one buying mortgaged property does not assume the mortgage debt; that he purchases simply the equity of redemption in the property; and that, as he does not undertake to pay the mortgage debt, he cannot be required to pay it, nor can anything due him be applied by the court to its payment further than the property itself. Consequently, it is said in this case that the income of this property for the three years and eight months that the purchasers were in possession between the two sales was, by virtue of the fact that it was ousted from the possession at the time of the first sale, rightfully due the Huguley Manufacturing Company, and that, as the balance of the mortgage debt was due by the Alabama & Georgia Manufacturing Company, that which was due the Huguley Manufacturing Company cannot be applied to the payment of the debt of the Alabama & Georgia Manufacturing Company.

The difficulty about this contention is that the amount found by the master as rents and profits is the rents and profits of the mortgaged property, and during the period when the mortgagee was in possession as purchaser under a sale regularly made under a decree of this court. Their possession was not illegal in the sense that it was wrongful or usurped; indeed, it can hardly be said that their possession was illegal at all. They certainly went lawfully into possession of the property; and, after restitution was ordered by the court, it was on terms which the Huguley Manufacturing Company failed to comply with; and the effect of that order undoubtedly was to recognize the justice of their possession until the Huguley Manufacturing Company did that which the court had required as a prerequisite to restitution. But the effect of all the decisions unquestionably was, and the order of the court was, that their holding was such that they must account for the rents and profits during the three years and eight months referred to. Now, should the amount of the rents and profits be paid over to the Huguley Manufacturing Company, or be applied to the extinguishment, so far as it will go,

of the deficiency decree? It seems to me beyond question that the purchasers are entitled to have this amount applied to the balance due on their debt. In the first place, the original petition filed in this case for restitution and for an accounting, etc., asked that the rents and profits of the property should be applied to the payment of the mortgage debt. The language of the petition, after asking that the rents and profits be applied to the repayment of such portion (if any) of $10,000 as petitioners might be held liable for, asked that the same be applied "next to the payment of any interest in arrears on said $65,000 of said bonds, and that then the remainder be paid to the Huguley Manufacturing Company." In addition to this, the court, by its order of June 25, 1896, on the coming in of the report of the commissioner making the second sale, provided, among other things, as follows:.

"It is ordered, adjudged, and decreed that, should the said accounting finally result in a judgment in favor of the Huguley Manufacturing Company, then such judgment, for any amount thereof in excess of any deficiency due by the defendants to the complainant in the foreclosure proceeding, shall, for such excess, be and remain a lien upon said property in favor of the Huguley Manufacturing Company, as against the purchasers at said sale, or any persons holding under them."

So it appears that the Huguley Manufacturing Company, through its counsel, conceded prior to the filing of the report by the special master that the rents and profits should be applied to the extinguishment of the remainder of the mortgage debt. It is unnecessary, however, to hold the Huguley Manufacturing Company to the language of their petition or of the order referred to, for the purpose of disposing of the case; but the prayer of their petition and the order of court (which was taken at the time without objection, so far as appears) indicate what the view of counsel for the Huguley Manufacturing Company, and, indeed, counsel on both sides, was at that time as to the application of these rents and profits. But, independently of this, the rule seems to be thoroughly established by all the authorities that where a mortgagee goes legally into possession of the mortgaged property, as these mortgagees certainly did, they are only accountable for the rents and profits by the application of the same to their debt. These people were in possession of the property on which they had their mortgage, and were operating the property after having gone into possession under a decree regularly entered and a sale regularly made. They made these profits themselves. Shall it be held that they must pay them over to another so long as their debt for the whole of which they were given a lien on the mortgaged property remains unpaid? It must be remembered that, during the time of their possession between the two sales, the whole mortgage debt, with its lien, existed against the property. The first sale having been set aside, the mortgage and the whole debt stood open against the property; and therefore these purchasers, it seems to me, stood like any other mortgagee going legally into possession of property, with the duty to account for the rents and profits, but with the equal right to apply the same to their mortgage debt.

It is not denied, as I understand it, in the argument, that, if a bill had been filed alleging insufficiency of this property to pay the mortgage debt, the court would have appointed a receiver, and would have, through such receiver, impounded the rents and profits in order to apply the same to the mortgage debt. It is replied, however, that no such allegation was made when the bill was filed, and no receiver asked for. The result has shown conclusively that the property was insufficient to pay the mortgage debt, and will the court deprive these mortgagees of the benefit of that which they themselves have made in the way of rents and profits while in possession as indicated, when it would, by positive order, have given them the benefit of such rents and profits if they had asked for them in advance?

In Kountze v. Hotel Co., 107 U. S. 378, 2 Sup. Ct. 911, it is held that:

"Courts of equity always have the power, where the debtor is insolvent, and the mortgaged property is an insufficient security for the debt, and there is good cause to believe that it will be wasted or deteriorated in the hands of the mortgagor, as by cutting of timber, suffering dilapidation, etc., to take charge of the property by means of a receiver, and preserve, not only the corpus, but the rents and profits, for the satisfaction of the debt."

This doctrine is reiterated in Grant v. Insurance Co., 121 U. S. 105, 7 Sup. Ct. 841, and in Shepard v. Pepper, 133 U. S. 626, 10 Sup. Ct. 438.

It is not denied by counsel for the Huguley Manufacturing Company that, as against the Alabama & Georgia Manufacturing Company, the bondholders in possession would have had the right to have these rents and profits applied to the extinguishment of the mortgage debt. Where, by private sale or by judicial sale, the equity of redemption passes out of the mortgagor into a third party, does the third party acquire any more rights in this respect than the mortgagor had? In other words, can the rights of the mortgagee which have passed to him by the contract of mortgage be affected in any way afterwards by change in any respect in the holder of the equity of redemption? If so, it would be in the power of the mortgagor to give to a third party rights as against the mortgagee which he himself did not have. It being fundamental that the mortgagee in possession has the right to apply the rents and profits to the extinguishment of the mortgage debt as against the mortgagor, the contention, it seems, is entirely unsound that a third party could claim such rents and profits when the mortgagor himself could not. If so, the inviolability which is supposed to be attached to valid contracts is to that extent destroyed.

The light thrown on this case by the very full and able argument on both sides of this last question makes it exceedingly doubtful in my mind whether the proper direction was given the case at the time application was made by the Huguley Manufacturing Company for restitution. I am not clear but that the right course would have been to have only allowed these purchasers to be disturbed in their possession by the payment to them of the mortgage debt, or, at least, of that part of it which, by the finding of the master, had failed to

receive interest, and which was entitled to foreclosure. It is, of course, useless to discuss that matter now, except as it may help to elucidate the present question.

In the case of Bryan v. Kales, 162 U. S. 441, 16 Sup. Ct. 802, it is held:

"When a mortgagee is in possession of the mortgaged real estate, claiming under a foreclosure sale, one claiming under mortgagor cannot, by setting up that the foreclosure proceeding was invalid, maintain ejectment to recover the premises, without his offering to redeem and tendering payment of the mortgage debt."

It is said in reply to this case, by counsel for the Huguley Manufacturing Company, that, in the case cited, it was a collateral attack upon the judgment of foreclosure; but an examination of the opinion shows that the court waived any expression of opinion as to whether it was open to attack collaterally, and simply decided that, in any event, the rule just announced, which is the headnote of the case, was the correct one, and was controlling independently of other questions.

If the Huguley Manufacturing Company could not oust the purchasers in this case without paying to them the entire mortgage debt, how can they claim for themselves that which went into the hands of the purchasers as rents and profits of the property, so long as it is insufficient to discharge the mortgage debt? It seems too clear for discussion that, so long as the mortgagees have not received more than the amount of their debt out of the property, one claiming under the mortgagor cannot sustain a claim against them for that which is earned by the property.

A large number of authorities have been cited on both sides in this discussion, and the argument has taken rather a wide range, but I deem it unnecessary to go further into the case. The contention for the Huguley Manufacturing Company has been very thoroughly and very ably presented, but I do not think it is sound. It seems clear to me that these bondholders, as purchasers, while in possession, were entitled to have the rents and profits derived from the mortgaged property applied to the payment of the bonds and interest thereon, and that the Huguley Manufacturing Company is not entitled to the same.

At the time the purchasers took possession of this property, there were on hand certain "findings," as they are called,—certain personal property in the mill, which was not covered by the mortgage. This was used by the purchasers, and the special master, in his report, values the findings at $2,500. This report was confirmed by the court. It is apparent that the money derived from this source cannot be applied to the mortgage debt. It is earnestly contended, however, that, if this property was not embraced in the mortgage, the court has nothing to do with that in this case; that the finding of the master was gratuitous; and that the parties should be left to their legal remedy outside of this litigation. The court put these purchasers in possession of all of this property, and the findings were on hand in the mill at the time the possession was awarded. Therefore the proper application of this amount, in or-

der to do complete equity and wind up this litigation, should be determined by the court here and now.    As to this $2,500, I am of opinion that it must be accounted for to the Huguley Manufacturing Company by the Galeton Cotton Mills.    As to the amount found by the special master for rents and profits of $35,857.53, it must go, so far as it does, to the extinguishment of the mortgage debt and interest.    A decree may be taken in accordance with these views.

(April 26, 1898.)

In this case the court decided, in an opinion filed on the 11th inst., that the deficiency decree, as to the balance due the mortgage debt, could be set off against the rents and profits.    It was taken for granted in that decision that the deficiency decree somewhat exceeded the amount found for rents and profits.

Counsel for the Huguley Manufacturing Company now seek to have the rents and profits applied to the deficiency decree, or credited thereon in such way as to change the result, and leave a small balance in favor of the Huguley Company.    It is claimed that the rents and profits should be credited on the deficiency decree at the time such rents and profits were earned, and that the law will now apply them in that way.    So, as we have no data by which to apply them at stated intervals during the period of time that elapsed between the two sales, the 1st day of August, 1894, is taken by counsel as a period midway between the first and the last sale, upon the theory that it will establish an average, and the claim is that the credit should be made as of that date.    The result of this contention, if carried into effect, is really to increase the amount found by the special master in favor of the Huguley Manufacturing Company.    On some of the items found by the special master, he allowed interest from a period before the last sale, and on some he did not.    So that attention was necessarily called to this fact as it appeared in the report.    If fault was found with this report by the Huguley Manufacturing Company, it should have excepted to the same at the time the other exceptions were filed.    No exception was made on this ground, however, and the report was confirmed at the last term of the court.    I think the report of the special master, as modified by the court in the opinion filed February 23d of this year, fixes the amount which must be applied as against the deficiency decree.    There is no practical difficulty about the matter, because, to the extent that these purchasers are compelled to pay the expenses of this litigation, the same should be credited, I think, on the amount of rents and profits, which would wipe out the amount claimed in its favor by counsel for the Huguley Manufacturing Company.    The motion of counsel to make the application of these rents and profits in the manner set out in their last petition to the court will be denied.    The matter of apportioning the costs between the parties will be disposed of by a later order.